UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
GABRIEL PABON,

                              Plaintiff,

        - against -

NEW YORK CITY TRANSIT AUTHORITY,                    MEMORANDUM & ORDER
a/k/a NYCTA, a/k/a NYCT, METROPOLITAN               06-CV-2859 (RRM)(LB)
TRANSPORTATION AUTHORITY, a/k/a MTA,
ANTHONY BARTOLOTTA, MICHAEL
LOMBARDI and RICARDO JOHN,

                              Defendants.
--------------------------------------------------------X
MAUSKOPF, United States District Judge.

        Plaintiff Gabriel Pabon brings this action against the New York City Transit Authority

(the "Transit Authority")[1] and its employees, Anthony Bartolotta, Michael Lombardi and

Ricardo John. Pabon alleges violations of the Americans with Disabilities Act ("ADA"); 42

U.S.C. 1985(2), the First, Fifth, and Fourteenth Amendments to the United States Constitution;

Section 75-b of the New York Civil Service Law; Section 740, *et seq.* of the New York Labor

Law; Section 296 of the New York State Executive Law (the Human Rights Law); Chapter 8-

107 of the New York City Administrative Code, and unspecified common law torts. For the

reasons below, Defendants' motion for summary judgment is GRANTED as to all federal causes

---

[1] Although complete disposition of this federal action renders the point moot, Defendants here, particularly the Transit Authority, challenge suit against other corporate entities sued herein, including the Metropolitan Transportation Authority (the "MTA"). The record amply supports, and this Court agrees with, Defendants' contention that Pabon was exclusively a Transit Authority employee, and otherwise without connection or affiliation to the other entities sued here, particularly the MTA. The Transit Authority, which exists as an independent legal entity capable of defending against suit in its own name, is therefore the proper Defendant in this case. Claims against all other entities, including the MTA in its various names, are hereby dismissed. *See Hargett v. Met. Transit Auth.*, 552 F. Supp. 2d 393, 405-06 (S.D.N.Y. 2006) (dismissing improper suit against the MTA, as here, noting that: pursuant to N.Y. Pub. Auth. L. § 1204(11) (2007), the Transit Authority has the power to "assist and cooperate with the [MTA] in furtherance of the purposes and powers of the [NYCTA];" however, the two companies are legally separate public benefit corporations. Thus, each can sue and be sued in its own right and each makes its own organizational and management rules and regulations).

of action. This Court declines to exercise 28 U.S.C. § 1367 supplemental jurisdiction over Pabon's remaining state law claims, and those causes of action are DISMISSED.

## FACTUAL BACKGROUND

Until the termination of his employment in March 2005, Pabon was a Train Service Supervisor with the Transit Authority.

It is uncontroverted that on October 7, 2004, Pabon caused substantial damage to the offices of psychiatrist Peter Sass. The episode occurred during the course of an independent medical examination, which sought to determine Pabon's fitness for duty in connection with his then-pending worker's compensation claim. Sass's letter to the Transit Authority regarding the incident states that Pabon became violent when Sass recommended a return to "full work" duty. At that point, according to Sass, Pabon overturned and broke the office furniture and stole the tape recorded record of the medical examination. Pabon's outburst allegedly caused Sass to flee the office. Sass then called the police.

As a result of the episode at Sass's office, and pursuant to an applicable collective bargaining agreement process, the Transit Authority took disciplinary action against Pabon. At the conclusion of that process, Pabon's employment was terminated.

On June 5, 2006, Pabon commenced this civil rights action challenging the propriety of his termination. Pabon claims that he was denied a fair opportunity to participate in the disciplinary process and that the process itself was merely a pretext for disability discrimination, and/or the culmination of a consistent and vicious pattern of reprisal for his outspokenness regarding alleged negligence by the Transit Authority in the death of employee Michael Hamill. Pabon's claims are discussed in further detail below.

2

## A. Mental Disability

Pabon claims to have suffered an allegedly work-related nervous breakdown on or about

May 8, 2004. As evidence of his mental disability, Pabon submits medical testimony from his

treating psychologist Joseph L. J. Schwartz (see Affirmation of Joseph L. J. Schwartz, sworn Jan.

15, 2009 ("Schwartz Aff.")), which states, in relevant part:

> Within a reasonable degree of medical certainty Gabriel Pabon's mental
> disability manifested itself as a mental impairment that substantially
> limited ... the ability to socialize within normal limits, the ability to
> interact with people within normal limits, the ability to deal with ordinary
> occurrences of life, the ability to concentrate for any significant period of
> time, the ability to sleep, the ability to work effectively, the ability to relax
> and separate stressful experiences and be able to adjust to life within
> normal limits, the ability to live without fear and/or reprisal, the ability to
> focus, the ability to control anger and irritability, the ability to complete
> tasks beyond simple tasks, the ability to care for himself ....

As stated in Pabon's Opposition papers, his mental condition left him "unable to interact

with people, deal with ordinary occurrences, or live without fear or paranoia." Plaintiff's

Memorandum (docket no. 73) at 14. As a result, Pabon filed for worker's compensation

benefits. It was in connection with the worker's compensation process that Pabon was required

to undergo the independent medical evaluation at Sass's offices in October 2004. Accordingly,

it is Pabon's position that the Transit Authority was well aware of his significant mental

impairments even prior to his destructive episode. Pabon further claims that, notwithstanding

knowledge of Pabon's mental disability and its effect on his job performance, the Transit

Authority failed to make reasonable accommodations in the conditions of his employment,

including a change of location, reduction in responsibilities, relegation to office work, job

restructuring, part-time work, or reassignment to a vacant position. However, while Pabon

claims that such accommodation should have been made, he does not dispute the fact that he failed to affirmatively request any such accommodation.

Finally, Pabon argues that his ultimate termination from the Transit Authority was the result, at least in part, of disability-based animus and in retaliation for his reporting Transit Authority negligence.

## B. Hamill Incident

In March 2002, Transit Authority employee Michael Hamill was killed in an accident at a Transit Authority worksite. Pabon claims that in his role as transit supervisor, he learned that the accident involved the negligence of several Transit Authority employees. Pabon further claims that his attempts to report the matter to higher-ups at the Transit Authority, as was his duty under applicable Transit Authority regulations, were met with strong-arm tactics, including physical violence, threats, harassment and intimidation. Specifically, Pabon claims that he was roughed up on several occasions, having been shoved and thrown to the ground – incidents that caused him to sustain neck and back pain that would ultimately contribute to his worker's compensation claims. More importantly, Pabon claims that certain of the individual defendants in this case threatened to hurt him (allegedly at gun point in one instance) and even threatened his life and that of his family members if he continued to discuss the Hamill matter within the Transit Authority, or further assist the plaintiffs in Hamill's wrongful death civil lawsuit, whose attorneys Pabon had met with previously.

Pabon claims that his complaints of harassing and threatening conduct were ignored by the Transit Authority, who dismissed Pabon's claims as unfounded after what he alleges was a sham investigation. Ultimately, Pabon claims that the emotional strain and fear of personal

reprisals from his immediate superiors resulted in the nervous breakdown that he allegedly suffered in May 2004.

## C. Pabon's Termination

In response to Pabon's allegations of pretextual termination, the Transit Authority maintains that he was properly dismissed for "ransacking" Sass's office, conduct unbecoming a Transit Authority employee. Moreover, the Transit Authority claims that Pabon was afforded all due process rights afforded by the governing collective bargaining agreement. The chronology of that process is outlined below.

Pabon was sent a disciplinary notice, indicating that a hearing would be held on November 4 or November 5, 2004. Pabon then sent notice that he would appeal the disciplinary action and that he would not appear at the scheduled hearing, stating:

> I feel I am not in control of myself and cannot be held liable for my actions. It appears that the T.A. wants me to appear downtown. I am incapable of making decisions for myself at this point in time and cannot concentrate. I must request armed security personnel for my safety and the safety of my family due to threats I have received through the previous 2 years.

Despite notice that, pursuant to the collective bargaining agreement, his failure to appear would be deemed abandonment of the grievance process, Pabon did not appear at the scheduled hearing. Based on Pabon's failure to appear his employment was terminated. The next day, however, Pabon's union filed a grievance on his behalf seeking to re-litigate the Transit Authority's "abandonment" finding.

At a hearing held November 17, 2004, an independent hearing officer reopened the record expressly to permit Pabon to provide medical evidence sufficient to excuse his prior failures to appear. Despite the opportunity to provide medical evidence, however, Pabon did not do so. Instead, he appeared in person with his union representative, but claimed not to

5

understand the proceedings. The union represented to the hearing officer that Pabon was under a doctor's care and lacked the capacity to participate in his own defense. Unswayed by Pabon's unsupported allegations of incapacity, the hearing officer held that despite a fair opportunity to submit evidence in his defense, Pabon failed to demonstrate that he had not abandoned the grievance process.

The union again appealed the now affirmed "abandonment" determination on December 23, 2004. On January 4, 2005, a hearing was held in front of an independent Arbitrator who ordered that Pabon should be provided another opportunity to challenge the abandonment finding. Accordingly, the matter was remanded to a preliminary "Step I" abandonment hearing, scheduled for January 25, 2005, with a further arbitration hearing scheduled for February 10, 2005, should Pabon seek to appeal the Step I determination. Notwithstanding these further opportunities, Pabon failed to appear at the January 25, 2005 hearing. Finally, on March 9, 2005 the arbitrator issued an arbitration award finding that the "abandonment" finding should be affirmed.

It is the Transit Authority's position that Pabon's ultimate termination was solely the result of the disciplinary process.

## SUMMARY JUDGMENT STANDARD

In the summary judgment context, the evidence adduced must be construed in the light most favorable to Pabon, as the non-movant. *See, e.g., Holtz v. Rockefeller & Co.*, Inc., 258 F.3d 62, 69 (2d Cir. 2001). Summary judgment is appropriate only where there exists no genuine issue of material fact, and the onus to establish the absence of such factual issues falls squarely upon Defendants as the moving parties. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Upon such showing, the onus shifts to Pabon to present evidence sufficient to satisfy every

element of the claim. In so doing, Pabon is required to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. But in assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in Pabon's favor. *Anderson v. Liberty Lobby, Inc.*, 47 U.S. 242, 249-50 (1986).

## DISCUSSION

### A. Disability Discrimination

ADA claims are reviewed under the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Sykes v. North Fork Bank*, 2009 WL 5042531, at *1 (E.D.N.Y. 2009) (citing *Heyman v. Queens Vill. Comm. for Mental Health*, 198 F.3d 68, 72 (2d Cir.1999)). To establish a *prima facie* disability discrimination case under the ADA, plaintiff must show (1) that his employer is subject to the ADA, (2) that he suffers from a disability within the meaning of the ADA, (3) that he was otherwise qualified to perform his job functions with or without reasonable accommodation, and (4) that he suffered an adverse employment action because of his disability. *See Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).

Pursuant to the *McDonnell Douglas* requirements, once the plaintiff has established the *prima facie* case, the burden then falls upon the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006). The defendant satisfies this burden if the reason given, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). Typically, it is not for

courts to question the quality or wisdom of the reason, so long as it is not unlawfully discriminatory. *Id.*

In order to survive summary judgment once the defendant has produced a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff must allege evidence that suggests that it is more likely than not the case that the reasons offered are mere pretext designed to cover up the employer's actual discriminatory intent. *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000)). The plaintiff does not have to show that the employer's reasons are false nor that they played no role in the decision; rather, she must show merely that the proffered reasons were not the only reasons and that discriminatory animus was at least one of the motivating factors for the adverse employment action. *Cronin v. Aetna Life Ins., Co.,* 46 F.3d 196, 203 (2d Cir. 1995). Thus, the ultimate burden of persuading the finder of fact that the employer intentionally discriminated lies with the plaintiff at all times during this burden-shifting process. *Holt v. KMI-Cont'l, Inc.,* 95 F.3d 123, 129 (2d Cir. 1996).

1. Pabon is not a qualified individual within the meaning of the ADA

Pabon's *prima facie* ADA claim fails most clearly in that he cannot demonstrate his qualifications for the Train Service Supervisor position. A "qualified person with a disability" is a person with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). EEOC regulations define "essential functions" as the "'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" *Stone v. City of Mount Vernon,* 118 F.3d 92, 97 (2d Cir. 1997) (citing 29 C.F.R. § 1630.2(n)(1)). In determining whether an individual can perform the essential functions of a job, "a court must

give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) (internal quotation marks omitted). Here, Pabon fails to demonstrate an ability to perform the essential functions of his Train Service Supervisor duties, either with or without a reasonable accommodation.

The uncontroverted record on summary judgment evidences Pabon's severe mental dysfunction. Notwithstanding an allegedly violent episode in which Pabon is said to have wreaked havoc in a psychiatrist's office, the record of Pabon's disciplinary process alone – in which Pabon admitted an inability to comprehend the proceedings – indicates an inability to function in a work environment.[2] This point is only reinforced in Pabon's Opposition papers, which allege a similar inability to interact with others, socialize or effectively communicate during the time of his termination and subsequent grievance process. As such, it is undisputed that Pabon's disability rendered him fundamentally unqualified to perform *any* duties at the Transit Authority, let alone the complex duties required of a Train Service Supervisor. Those duties, which involved supervision of multiple train lines and responsibility for up to 80 employees at any given time (see, Amended Complaint (docket no. 36) at ¶¶ 30-31), clearly required extensive communication and interpersonal skills in interacting with subordinates, supervisors, and members of the subway-riding public, and the ability to problem-solve under conditions of stress.

> TRAIN SERVICE SUPERVISOR, Rule 102. (a) Train Service Supervisor will report to Superintendents of Rapid Transit Operations. (b) They have general supervision over the qualification and performance of all Train Conductors, Conductors and Tower Operators. (c) They must

---

[2]    The uncontroverted record supports conclusions reached by Pabon's treating psychologist, that he could not (1) interact with people, (2) deal with ordinary occurrences, (3) concentrate, (4) work effectively, (5) focus, and (6) complete tasks other than simple tasks.

ride trains frequently, not the manner in which train service employees perform their duties, and correct any improper actions. (d) They must report promptly any violations of the rules or any neglect of duty on the part of employees. (e) They must conduct, as required, a school of instructions on car equipment and train operation for such employees as shall be designated by the proper authorities. (f) They must promptly investigate all complaints, accidents or delays to service and render whatever assistance is possible. (g) When on or at the location of disabled train, they are responsible for and must assist in the safe movement of such train. ....

As of May 2004, Pabon's mental injuries prevented him from performing each and every one of these essential tasks and caused him to withdraw completely from Transit Authority employment on disability leave from which he did not attempt to return.

### 2. Pabon fails to establish a reasonable accommodation claim

Even assuming that Pabon qualified for ADA protections, his reasonable accommodation claim must fail. As a threshold matter, Pabon fails to identify a reasonable accommodation, "the costs of which, facially do not exceed its benefits." *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122 (2d Cir. 1999). Although "'reasonable accommodation' may include such adjustments as modification of physical facilities, work schedules, or equipment, see 45 C.F.R. § 84.12(b), 'reasonable accommodation' does not mean elimination of any of the job's essential functions." *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir.1991); *see also Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 384 (2d Cir. 1996). As stated more fully below, Pabon utterly fails to identify a permissible reasonable accommodation which would allow him to perform the essential functions of his jobs. Nor has he sought or even identified any other available vacant positions for which he might otherwise have qualified. *Bonner v. N.Y. State Elec. & Gas Corp.*, 195 F. Supp. 2d 429, 435-36 (W.D.N.Y. 2002). Finally, he manifested no intention to ever return to his Transit Authority employment in any capacity.

First, the purported severity of Pabon's condition – as attested to by Pabon and supported by Dr. Schwartz's reports – is a sufficient ground upon which to deny his accommodation claim. Although Dr. Schwartz's medical testimony indicates his belief that by sometime in summer 2004, Pabon was able to perform limited work, it is only with the caveat that Pabon be wholly removed from his onsite work environment, absolved of any obligation to communicate with others, and essentially stripped of his prior professional responsibilities. (*See* Schwartz Aff. at ¶ 15 ("[As of May 2004] I indicated that [Pabon] was capable of doing some type of work, but it would have to be at his own home as he wasn't ready to relate with others in person …").)[3] What Schwartz suggests is by no means a plausible accommodation. *Cf. Bonner*, 195 F. Supp. 2d 429, 435-36 (W.D.N.Y. 2002). To give effect to such theoretical accommodation would fundamentally alter the terms and conditions of Pabon's employment, by essentially crafting a wholly new position, as it cannot be reasonably argued that Pabon could perform any of his former onsite supervisory duties from the complete seclusion of his home. The ADA foists no such burden upon employers. Accordingly, Pabon's failure to identify, as he must, a plausible accommodation that would have allowed him to continue performing his duties on behalf the Transit Authority is therefore fatal to his reasonable accommodation claim. *See Querry v. Messar*, 14 F. Supp. 2d 437, 444 (S.D.N.Y. 1998).

Second, even if a reasonable trier of fact were to find Pabon employable to some degree, the record is devoid of any suggestion that Pabon ever actually sought any accommodation. While the Court is aware that in certain cases the employer is tasked with reaching out to an employee whose medical disability is well-known, *cf. Felix v. Transit Auth.*, 154 F. Supp. 2d 640, 657 (S.D.N.Y. 2001), the evidence here creates no genuine issue of fact on the matter. To

---

[3] Schwartz's view that Pabon was incapable of interacting with others ends any suggestion that a transfer away from the allegedly offending individual Defendants in this case would have ameliorated the situation and allowed Pabon to work effectively.

the contrary, the undisputed testimony is that after suffering his nervous breakdown in May 2004, Pabon left his Transit Authority duties and did not work, nor seek to return to work, in any capacity. He cannot now be heard to complain that his employer failed to offer a reasonable employment accommodation. *See Ramos-Boyce v. Fordham Univ.*, 419 F. Supp. 2d 469, 474 (S.D.N.Y. 2005) (holding fatal to plaintiff's accommodation claim the fact that plaintiff's consistent position throughout leave period that she was totally disabled and could not return to her job). Accordingly, this Court is in accord with the determination reached in *Ramos* on facts similar to those presented here.

### 3. Pabon's fails to establish a disability discrimination claim

Notwithstanding the above discussion, even if Pabon were able to establish a *prima facie* ADA claim, his claim of disability discrimination would fail. The incident at Sass's office is a sufficient, nondiscriminatory basis to support the disciplinary charges complained of here. Although Pabon explains that the incident was the unfortunate result of a panic episode rather than deliberate violence, the proffering of charges by the Transit Authority cannot reasonably be viewed with suspicion in light of Dr. Sass's report of Pabon's disturbingly violent behavior, the necessary involvement of police, and the receipt of a police report concerning allegations of Pabon's "criminal mischief." *Cf. Graham v. Boehringer Ingelheim Pharm., Inc.*, 451 F. Supp. 2d 360, 364 (D. Conn. 2006) (finding legitimate nondiscriminatory basis for placing employee on administrative leave and requiring psychological evaluation after receiving a disputed

allegation that employee made a threat to co-workers).[4] That the Transit Authority may have promptly sought discipline does not, by itself, give rise to an inference of disability animus necessary to rebut the Transit Authority's contentions. Nor has Pabon demonstrated any other plausible basis upon which to doubt that disciplinary procedures in this case arose from a legitimate allegation of violence, and not as a pretext for disability discrimination. Finally, although it is a keen distinction, the fact that the events at Sass's office may have been the result of Pabon's disability does not permit a claim that Pabon's discipline was disability-based. *Cf. Sista v. CDC IXIS N. Amer.*, 445 F.3d 161, 172 (2d Cir. 2006) ("This Court ... does not read the ADA to require that employers countenance dangerous misconduct, even if that misconduct is the result of a disability."); *see also Palmer v. Cir. Ct. of Cook County, Soc. Svcs. Dep't*, 905 F. Sup. 499, 510 (N.D. Ill. 1995) (finding that plaintiff's termination for aggressive behavior did not causally implicate her disability, even where it was acknowledged that such behavior was the manifestation of her mental disability).

For the reasons above, Pabon's ADA claim fails in its entirety and summary judgment is warranted. Further, Pabon's related disability-based claims alleging discrimination, failure to accommodate, retaliation, and aider and abettor liability under New York Executive Law § 296,

---

[4]     The allegation of violence here has particular traction in this case, as it was a report of employee violence submitted by an independent treating physician tasked with assessing that employee's fitness. As stated in *Graham*, "Any reasonable company would be concerned about its own exposure to liability (let alone the safety of its employees) should it choose to overrule an independent mental health expert whom the company asked to perform a fitness for duty evaluation of a company employee." *Graham*, 451 F. Supp. 2d at 369 (citing *Palmer v. Circuit Court*, 117 F.3d 351, 352 (7th Cir. 1997) ("The [ADA] does not require an employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge -- in jeopardy of violating the Act if it fired such employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone."); *see also Sista v. CDC IXIS N. Amer.*, 445 F.3d 161, 172 (2d Cir. 2006) ("This Court ... does not read the ADA to require that employers countenance dangerous misconduct, even if that misconduct is the result of a disability.").

and the Administrative Code of the City of New York, Chapter 8-107[5] are dismissed, as they each rely upon an analytical framework that substantially mirrors the ADA analysis. See *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 n.1 (2d Cir. 2000). Accordingly, Defendants' motion for summary judgment is granted as to these claims.

## B. Fifth and Fourteenth Amendment Due Process

As an initial matter, Pabon's Fifth Amendment due process claim fails. The Fifth Amendment's civil due process component is inapplicable here, see *Abidekun v. N.Y.C. Tr. Auth.*, 1998 WL 296372, at *2 n.1 (E.D.N.Y. June 4, 1998) ("The Fifth Amendment applies only to the federal government; therefore, allegations of federal action are required to state a claim for deprivation of due process in violation of the Fifth Amendment." (citing *Kia P. v. McIntyre*, 1998 WL 180603, at *3 n.2 (E.D.N.Y. Apr. 15, 1998)), and is otherwise made redundant by his Fourteenth Amendment claim. Pabon's Fifth Amendment claim is therefore dismissed.

As to his Fourteenth Amendment claim, there is no dispute that Pabon's Transit Authority employment constituted a protectable interest sufficient to warrant due process protections. *See Kriegsman v. N.Y.C. Transit Auth.*, No. 1988 WL 138273 (E.D.N.Y. Dec. 16, 1988). Moreover, it is clear that the grievance procedures afforded by the Transit Authority under the applicable collective bargaining agreement, and its attendant amendments, have long been held to satisfy the constitutional requirements of due process. *Id.* Accordingly, Pabon's due process claim is limited to a complaint that the individual hearing officers involved erred in

---

[5]    Defendants alternatively argue that, pursuant to recent legislative amendments, the New York City Administrative Code is rendered inapplicable to the Transit Authority. *See* Pub. Auth. Law § 1266(8); *see also Everson v. N.Y.C. Transit Auth.*, 216 F. Supp. 2d 71, 81 (E.D.N.Y. 2002) (finding New York Administrative Code inapplicable even prior to legislative amendment); *Muhammad v. N.Y.C. Transit Auth.*, 450 F. Supp. 2d 198, 206 (E.D.N.Y. 2006) (same); *but see Simmons v. N.Y.C. Transit Auth.*, No. CV-02-1575, 2008 WL 2788755, at *6 n.8 (E.D.N.Y. July 17, 2008). While this Court has no reason to doubt the effectiveness of the amendments to the Administrative Code, for the reasons above, this Court need not reach that issue.

failing to properly consider Pabon's incapacity or otherwise ignored available evidence of such condition when they determined that he had abandoned his adjudicative rights.

This Court is persuaded that the constitutionally sufficient remedies available to rectify any technical or procedural errors in the Transit Authority's robust grievance process, including resort to an Article 78 appeal proceeding, preclude a due process claim here. *See Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996). Moreover, this Court is cognizant that while Pabon's mental incapacity may have rendered him incapable of participating in the discipline process, the hearing officers and arbitrators were entitled to request the timely submission of documentary evidence of such condition. Moreover, they were entitled to receive such information directly, regardless of what information may or may not have been in the Transit Authority's possession. Finally, the Court notes that Pabon was represented during all such proceedings by his union representatives, who acted on his behalf in seeking appellate review and in representing to the relevant reviewing officers both verbally and in writing that Pabon's mental condition rendered him incompetent to proceed with the disciplinary process. Thus, the record here amply demonstrates that despite his alleged incapacity, Pabon had available to him assistance sufficient to comply with the very basic requests for documentary evidence made by the various hearing officers and arbitrators. Accordingly, and although this Court need not pass on the propriety of the disciplinary process as conducted here, this Court finds no error and no denial of due process in imposing discipline based on Pabon's repeated failures to comply. Pabon's due process claim is therefore dismissed.

**C. First Amendment Retaliation, Civil Conspiracy, and Witness Intimidation Claims**

Pabon also alleges threats, intimidation, and violence at the hands of the individual defendants. Taken as true on summary judgment, these allegations do not give rise to actionable federal claims.

### 1. First Amendment Retaliation claims

To establish a First Amendment retaliation claim, a public employee must demonstrate the following: (1) the speech at issue was protected; (2) he suffered an adverse employment action; and (3) "the speech at issue was a substantial or motivating factor in the adverse employment action." *Benvenisti v. City of New York*, No. 04 Civ. 3166, 2006 WL 2777274, at *7 (S.D.N.Y. Sept. 23, 2006); *see also Healy v. City of New York*, No. 04 Civ. 7344, 2006 WL 3457702, at *4 (S.D.N.Y. Nov. 22, 2006).

With respect to conduct either by the Transit Authority or by the individual Defendants, Pabon fails to establish First Amendment retaliation in that the speech at issue, *i.e.*, his report of negligence in the death of Michael Hamill, does not qualify as "protected speech" within the judicially construed meaning of the First Amendment, as recently discussed by the United States Supreme Court in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Pursuant to *Garcetti*, it is for the Court to address the strictly legal question of whether or not the speech at issue is protected by the First Amendment. *Garcetti*, 547 U.S. at 418; *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Healy*, 2006 WL 3457702, at *4-5; *Benvenisti*, 2006 WL 2777274, at *7.

Speech is considered protected where it pertains to a "matter of political, social or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983)); see also *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999) ("Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide ...."), and in so making that

determination, courts consistently have held that, where, as here, "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes," *Garcetti*, 547 U.S. at 421, and that the First Amendment does not protect that form of employee speech from discipline or retaliation by the employer. *Weintraub v. Bd. of Educ.*, 489 F. Supp. 2d 209, 219 (E.D.N.Y. 2006), *aff'd* 593 F.3d 196 (2d Cir. 2010).

Here, by his own admission, Pabon simply cannot show First Amendment-protected speech of the type contemplated in *Garcetti*, as the speech at issue was merely the product of his official duties as a Train Service Supervisor. *See e.g.*, *Carter v. Incorporated Village of Ocean Beach*, No. 07-CV-1215, 2010 WL 599388, at *4 (E.D.N.Y. Feb. 19, 2010) ("When a public employee raises complaints or concerns up the chain of command ..., that speech is undertaken in the course of performing his job."). This dispositive fact cannot be clearer. Indeed, in Pabon's complaint to the Equal Employment Opportunity Commission, which is submitted in opposition to summary judgment, he stated, in relevant part, as follows:

> I was the Train Service Supervisor in charge of the Flaggers for March 20, 2002. ... . I ... responded to the above incident and rendered my assistance. I am obligated by the Book of Rules and Regulations to find the truth about all matters related to incidents that affect the subway. This is evidenced under Rule 102, which states the duties of a Train Service Supervisor, subsection "b", "d" and "f" which states respectively, "They have general supervision over the qualification and performance of all Train Operators, Conductors and Tower Operators."; "They must report promptly any violation of the rules or any neglect of duty on the part of employees."; "They must promptly investigate all complaints, accidents or delays to service and render whatever assistance is possible." In addition I am bound by Rule 4 subsection "c" which states "Employees must render every assistance in their power in carrying out these rules and must report to their superiors any violation thereof." By following the Book of Rules and Regulations justly I uncovered the following events.

Thus, even Pabon's testimony evinces a clear understanding that his reportage of negligence was obligated by his professional duties. He therefore fails to demonstrate protected speech under the Supreme Court's *Garcetti* formulation. *See Benvenisti*, 2006 WL 2777274, at *9 n. 11 ("*Garcetti* teaches that an employee speaking pursuant to his official duties does not speak as a citizen for First Amendment purposes, even when his speech touches on matters of public concern."); *see also Huth v. Haslun*, No. 08-CV-2203, 2010 WL 839442, at *3-4 (2d Cir. Mar. 11, 2010) (complaints by New York State Thruway Authority employee were not protected as they were required by her official duties).[6] For these reasons, Pabon's First Amendment retaliation claim is hereby dismissed.

Finally, notwithstanding Pabon's failure to establish the requisites of *Garcetti*, his complaint of retaliatory termination, the only adequately pled claim of an adverse personnel action, would nonetheless fail for the additional and independent reason that Pabon cannot establish a causal connection between the termination of his employment and his involvement in the Hamill incident. *See McKinney v. Bennett*, 2009 WL 2981922, at *8 (S.D.N.Y. Sept. 16, 2009) (dismissing First Amendment retaliation claim for failure to establish requisite causal connection). Accordingly, his First Amendment retaliation claim against the Transit Authority is doubly defective and is therefore dismissed.

---

[6]     Moreover, there appears to be no dispute that his findings in connection with Hamill's death were reported exclusively through the Transit Authority's chain of command, and there is no claim that he discussed such matters outside of the Transit Authority. In support of his First Amendment claim, Pabon states only that it was not within his duties to report a criminal conspiracy to conceal negligent conduct. Even if this Court were inclined to distinguish Pabon's allegations of negligence from his conspiracy claims (*cf. Baker v. Gerould*, 598 F. Supp. 2d 357 (W.D.N.Y. 2009)), the record is utterly devoid of facts suggesting that he reported such concerns outside of the Transit Authority hierarchy. As such, his claims fail. *See Carter v. Incorporated Village of Ocean Beach*, No. 07-CV-1215, 2010 WL 2010 WL 599388, at *4 (E.D.N.Y. Feb. 19, 2010). As further discussed, *infra*, this Court notes an apparent meeting between Pabon and plaintiffs in a lawsuit brought by Michael Hamill's estate. While Pabon might conceivably have premised whistleblower or First Amendment claims on discussions had in that meeting, his failure raise the issue in opposition to summary judgment render any related whistle-blowing or First Amendment retaliation claim wholly speculative and insufficient to withstand summary judgment.

## 2. § 1985(2) Witness Intimidation

As for Pabon's § 1985 witness intimidation claims, they too must be dismissed. Pabon has failed to demonstrate that he was indeed a potential or viable witness in a state or federal proceeding – a threshold showing necessary to support a witness intimidation claim. *Geaney v. McCarron*, 2003 WL 1701975, at *5 (S.D.N.Y. Mar. 31, 2003) (dismissing speculative witness intimidation claim unsupported by specific allegations or admissible evidence). Specifically, as evidenced by the summary judgment record, there is nothing that might reasonably suggest that Pabon was or would have been called in connection with *Hamill v. N.Y.C. Tr. Auth.*, No. 03-CV-01310, a wrongful death action brought by the estate of Michael Hamill in the United States District Court for the Eastern District of New York, or that Defendants prevented him from testifying in any way.

Notably, Pabon fails entirely to rebut the Defendants' assertions, made in their Local Rule 56.1 statement in support of summary judgment, that he met with the *Hamill* plaintiffs on at least one occasion prior to the commencement of that litigation. Pabon cannot therefore claim that Defendants acted to conceal his identity or that they actually succeeded in preventing him from discussing the matter with the *Hamill* plaintiffs. Moreover, Pabon's silence on the matter fails to demonstrate what, if any, chilling effect Defendants' conduct may have worked on that initial meeting. In any event, the Court notes that Pabon's termination form the Transit Authority, which occurred prior to the amicable resolution of the *Hamill* lawsuit in July 2005, would have provided Pabon ample opportunity to communicate with the *Hamill* plaintiffs free of the influence of the individual Defendants here. It appears, however, that at no point during the intervening period did Pabon make any attempt to reach out to them, nor did they reach out to him. More importantly, however, this Court notes that from the settlement of the *Hamill* lawsuit

through summary judgment in the instant action, Pabon has failed to obtain any affidavit testimony from the *Hamill* plaintiffs or their counsel to support his naked assertion that he was a potential witness to that action. *Cf. Chahal v. Paine Webber Inc.*, 725 F.2d 20, 24-25 (2d Cir. 1984) (noting strong factual support for witness intimidation claims, including affidavit testimony that plaintiff's testimony was sought but unobtainable at trial). Thus, because Pabon's witness intimidation claims are predicated on wholesale speculation, summary judgment is warranted.

### 3. § 1985(3) Conspiracy

Section § 1985(3) clearly provides a remedy for conspiracies to deprive persons of their rights under the United States Constitution. *Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 587 (2d Cir. 1988) (citing *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 103 (1983)). Such claims, however, must be predicated upon a causal link between the conduct complained of and animus or invidious discrimination that is based upon the plaintiff's membership in a protected class. *See Miller v. Bd. of Managers of Whispering Pines at Colonial Woods*, 457 F. Supp. 2d 126 (E.D.N.Y. 2006) ("Significantly, the conspiracy must be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.") (internal quotations and citations omitted); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 113 (1993) (holding that a class for purposes of § 1985(3) must be "something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the 'general federal tort law' it was the very purpose of the animus requirement to

avoid."); *see also Trautz v. Weisman*, 819 F. Supp. 282, 290-91 (S.D.N.Y. 1993) (analyzing §
1985(3) claims on the basis of disability).

Here, Pabon's conspiracy fails as he cannot establish a causal link between the
Defendants' harassing conduct and any class-based animus. In this case, Defendants'
motivations in engaging in alleged threats, intimidation, and violence against Pabon is ascribed
expressly to Pabon's alleged whistle-blowing action. Even if true, this motivation is an
insufficient basis upon which to invoke the protections of federal civil rights laws, as under §
1985(3). *Miller*, 457 F. Supp. 2d at 137 (dismissing §1985(3) claims premised upon personal,
rather than class-based animus). Accordingly, such claims are dismissed.

### D. State and Municipal Law Claims

Citing New York's common law of torts, its whistle-blower protection statutes (e.g., New
York Labor Law § 740 et seq. or New York Civil Service Law § 75-b), and State and municipal
human rights law (e.g., New York State Executive Law § 296 and Chapter 8-107 of the New
York City Administrative Code), Pabon complains of misconduct both institutional and
individual in retaliation for his attempts to bring to light Transit Authority negligence in the
death of Michael Hamill. However viable these claims may be, the dismissal of the predicate
federal claims divests this Court of principal jurisdiction. Retention and adjudication of these
non-federal claims would thus necessitate the discretionary exercise of supplemental jurisdiction
pursuant to 28 U.S.C. § 1367. However, this Court, as is its prerogative, declines to do so,
finding that Pabon's claims under the various State and municipal laws implicated here are more
appropriately determined in a State forum. Accordingly, because this Court need not and does
not retain supplemental jurisdiction over such claims, they are hereby dismissed.

**E. Damages**

Pabon's failure to sustain any viable claim against Defendants in this action renders moot his claim for damages. Accordingly, this Court declines to address Defendants' remaining arguments challenging the viability of certain damages categories, including: emotional distress, negligence damages in lieu of worker's compensation benefits, and punitive damages.

## CONCLUSION

In accordance with the disposition above, Defendants' motion for summary judgment is GRANTED as to all federal claims, including: the ADA; 42 U.S.C. 1985(2), (3); and the First, Fifth, and Fourteenth Amendments to the United States Constitution. In addition, pursuant to this Court's analogous federal ADA analysis, this Court further grants summary judgment as to Pabon's mirror New York State and municipal law claims, to the extent those claims are premised exclusively upon allegations of disability discrimination. The Court, in its discretion, declines the exercise of 28 U.S.C. § 1367 supplemental jurisdiction over Plaintiff's remaining non-federal causes of action, including those claims brought pursuant to New York common law; Section 75-b of the New York Civil Service Law; Section 740, *et seq.* of the New York Labor Law; non-disability related provisions of Section 296 of the New York State Executive Law (the Human Rights Law); and Chapter 8-107 of the New York City Administrative Code. Accordingly, those claims are DISMISSED. The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2010

                              _____
                              ROSLYNN R. MAUSKOPF
                              United States District Judge

22